Thank you, your honors. May it please the court, my name is Tom Woodbury and I'm here representing the appellants today in the Administrative Procedure Act case in which the court is asked to apply the arbitrary capricious standard to various decisions by the Kootenai National Forest Service to continue implementing their forest plan. This court has had occasion, Judge Smith and particular, to address the application of that standard in these types of cases and essentially the court has two different issues. One, is there, is the evidence support, substantial evidence support the decisions made by the Forest Service? And number two, and that's kind of a Forest Act sort of analysis, have they demonstrated basically compliance with their own forest plan? And then number two, which is equally relevant in this case, are there, is there evidence in the record that's compelling evidence that should have been addressed by the Forest Service? So those are basically in those two categories or all of our arguments fall. For the old growth arguments, Judge Smith stated in McNair decision that the Forest Service must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring the habitat. And those are basically the, for the old growth portion of this case, the basic issues of dispute. I've been doing these cases for about 12 years and I can honestly say this is the first time that I can stand before a judge and prove with evidence in the record and using the Forest Service's own methodology that they are no longer ensuring the viability of all growth species. And I can actually do that three different ways in this case. The first one I think is probably the clearest one and that is the Forest Service admits, and evidence in the record admits, that they no longer have enough habitat to support a viable population of their indicator species for old growth, the pileated woodpecker, under their own forest plan standard, which was that they should preserve 40% of the maximum potential habitat for that indicator species. Is this the 554 pairs versus the 335 pairs that you're referring to? What the, what the indicated requirement is? I'm sorry, your honor, I didn't... I'm referring to the, with respect to the woodpecker. Yes. You got the breeding pair analysis of what is required. The upper limit 554, the lower, the viability range is 335, and I gather that you dispute which of those is correct. Do I misunderstand that? That's not exactly true. What I, my position is not challenging that Forest Service, that Forest Service experts analysis, but rather the data and the application to the forest plan standard. Now if that expert, and that evidence in the record is saying, well the forest plan standard is really not correct, and we really don't need 40% of the maximum potential habitat of the pileated woodpecker, they should have raised that issue, A, in a forest plan amendment, and B, in the NEPA analysis, the environmental documents supporting their decisions in this case, and all of these decisions, and the fact of the matter is, that document is in the rest, in the NEPA documents themselves, and they've never amended the forest plan to say, oh we were wrong, and that all of the science, and you know the other important thing about that is, the forest plan cites the science that it relies on, and that 40%, and that science is Jack Ward Thomas 1979, which is still applied by all the forests, and that 40% standard is basically lingua franca in the, you know, species viability annals of the Forest Service, and has never been disputed. So this is the first time I've ever seen anybody say, well yes we don't have that, we're below that, but really we don't need it. And here's the critical point about that your honor, the reason he says it's not really necessary, is because we still find pileated woodpeckers in the forest, which is why, that was 2003, which is why we point out in the record in 1997, they had evidence that the pileated woodpecker actually is a generalist, and not a specialist, and can be found in all manner of forests, not just in old growth. So based on that, which they also don't disclose and discuss in any of their NEPA analysis, the pileated woodpecker itself, its populations, and whether you find it in the forest or not, is not the point. The point is its habitat, which is a proxy for 58 species of old growth dependent species. A third of the wildlife, which many of those species are specialists, that require high quality old growth habitat, and cannot be found in cut and uncut forests, and so on. In my backyard, you know, I mean my goodness, in Montana, pileated woodpeckers are everywhere. I see them in the park when I walk. And so I gather you agree that they are a general, not a specialist. It's not a specialist. We point out in the record, and they known that, and actually that was the reason in the Rittenhouse decision, where the court said, you know, they have reason to believe, and their experts have told them, that it's not a good indicator species. And they should have nominated another indicator species that does depend on old growth habitat, like the great gray owl, or many of the owl species, that are much more picky than pileated woodpecker. Aside from the species issue, and I understand you loud and clear, in terms of best available evidence, I read for the first time in in this case, perhaps it's my only been on the court for three years, I have never heard the argument that you measure this in terms of old growth condition prior to European settlement. Is that a new concept that you've come up with, or is that some you've used before? No, no. Basically what science and biology says, or assumes, is that species evolve under certain conditions, and those are the conditions that you need to provide in order for those species to... I guess what I'm getting at, Mr. Woodbury, is how does anybody know, at least other than a Native American, and I gather we've had no communication from does anybody know what the conditions of the forest old growth were prior to pre-European civilization of the area? It's pure speculation, isn't it? No, I don't I don't believe it is. Now tell me why that's wrong. How they would know, for instance, the Lessica 1995, one of the, what we and the Forest Service also recognizes as some of the best available signs of old growth habitat, they examined fire, fire analysis, you know, I'm not a scientist, but there are ways of looking at, I don't know, they look at the fire history and somehow, I don't know, I mean, you'd have to read Lessica to understand that, but that's how he determined, he determined it, and this is the important point, you know, that these forests in the region were about 20 to 50 percent old growth habitat, and the Forest Service, in this case, applied that science in the cuteney and actually came up with a different, slightly different figure of 17 to 42 percent, so they confirmed that with their scientists, and again, I don't know how, but that's... Mr. Woodbury, the problem I'm having with your argument is that you seem to be asking us to choose which science is best. Maybe I'm misunderstanding, but that, if I can glean one common principle from these cases, it is that we are not a board of scientists, and I'm not, I'm having a hard time following your argument, because I think what you're really asking us to do is to look at the science that the Forest Service has relied on and declare that it's bad science. For example, your statement that the Pileated Woodpecker is not a good indicator species. How can a judge, or three judges on a court of appeals, make that determination? You can. It's an admission in the record. The Forest Service itself, and we cited to the evidence in the record, that says why the Pileated Woodpecker is not an indicator, a valid indicator species for old growth specialists, because they find it in areas of the forest that are not old growth. Importantly, to your more general point, no, I'm asking the court to enforce the forest plan. The forest plan itself cites to the science that we're relying on, like Thomas 1979. It's cited in Appendix 17, you know, on the on the issue of effective what what old growth habitat meets the needs or what have old forest meets the needs of species. And we cite to Appendix 17, which says minimum 50 acre stands, and the Forest Service has a third of their inventory is below that. And the Forest Service says, well, that's just Appendix 17, and that's not enforceable. However, you know, what they fail to point out is that the forest plan, Wildlife Standard 4, incorporates Appendix 17 and says we will apply those guidelines. And Appendix 17 cites to the best available science that is still good science and hasn't been, you know, discarded. And so we're asking you simply to accept the science, all the assumptions that underlie the forest plan, and enforce the standards. And one of those standards is that they will ensure the viability of all old growth species by providing at least 40% of the maximum potential old growth habitat. And this is another second way to prove this, you know, apart from the Pileated Woodpecker, we have the Forest Service statement that they have about 10% effective old growth, about 12%, something like that, apart from the fragmentation issue. So can you talk about the fragmentation issue? I did not see any maps to show us whether these plots were contiguous or not. Is there anything in the record that would tell us where these plots are? I understand their regulations permit them to equalize, not equalize is probably the wrong word, but to consider the total amount of old growth in contiguous parcels to determine whether they're meeting the 10% old growth requirement. Is that right? Yes. Okay, and my question is really a simple one. Where in the record do I find the maps that show me that these have varying percentage figures are contiguous? Well, I don't know about maps, but we pointed out the number of stands below 50 acres. No, I mean I see listings of stands and I think the stands are numbered, and I see percentages of old growth in each stand. I see a regulation that says if stands are contiguous, you can add up the total amount of old growth divide by two, and if it's still 10% or greater, you meet it. What I'm asking you for is help in finding where in the record do I find something that tells me that these are in fact contiguous. I don't know that you can find that record in the record or that discussion in the EISs. What we are provided with by the Forest Service is just stand sizes and an explanation that in some cases the sense to count them as together, but we're not... when you have a third of your inventory that is below what is supposedly the minimum stand size for effective old growth for meeting the needs of the species, I think it's incumbent on the Forest Service to provide that discussion, Your Honor, and I'll ask Mr. Scott the same question and see what his answer is. Do you have any authority, Mr. Woodbury, that indicates that the Forest Service is required to demonstrate contiguity of these departments, if you will, in order to make up the 10% old growth? Well, they're required not... I mean, they're required not to count stands below 50 acres, so if they are counting stands below 50 acres, it's incumbent on them to show that that actually meets the needs of old growth species, because that's what the Forest Plan Standard says. So it's kind of like a rebuttable presumption, I suppose, once they're saying, you know, we're not... we're counting stands below 50 acres, then what we're saying is, well, some of these NEPA documents don't even disclose... don't even disclose how many stands are below 50 acres, and there's no discussion in those documents or maps and so forth explaining that rationale, so I can't provide that rationale, but the Forest Plan and the fact that it requires 10% effective old growth meeting the needs of species and the appendix and so forth. But the other point that I was getting to on proving the inadequate old growth is that... so the upper level of old growth, according to the National Forest Experts, is 42%, and so that again... Based upon the pre-European settlement concept... 17 to 42%, and so then under their science that they incorporated in the Forest Plan, Thomas, then the maximum potential habitat, and also Inland Empire, which says we can substitute habitat for populations, so 42% being the maximum means that to provide adequate habitat for all old growth species, you would have to provide 40% of that, which is 16.8%, and the Forest Service says maybe they have 12% if you ignore the fragmentation. So there... that's again... that's like 28% instead of 40% of the maximum potential habitat, so far below the 40% threshold. So that's the second way that the record proves this, and then the third way is on the 58... the fact that it's not effective by their own definition. So that's three ways that we've shown that they're no longer ensuring the viability of all the old growth species in the forest. You're assuming, are you not, that replacement old growth, if you will, is not accountable for purposes of the Forest Plan? I don't think it's necessary for the court to to get to that issue. You know, there's the 2017, which talks about the importance of legitimate old growth habitat, but under, you know, just taking the Forest Service's proxy-unproxy methodology, I mean, we don't have to prove ten ways that it's defective, you know, and so I don't... I mean, the lower court, you know, kind of deferred to the Forest Service, and we certainly don't want to say replacement old growth habitat is expendable, you know, in an area like this. Certainly what we agree with is the Forest Service cites science that in a heavily fragmented forest like the Kootenai, it's important to preserve those questionable old growth stands. I wouldn't want to have the reverse. You wouldn't want to have to say that, hey, if it's replacement old growth, you can cut it down anytime you want. That's right. Counsel, is there anything in a forest plan, either for the Kootenai forest or the general forest plan, that requires the service to do anything more than provide for the viable population of the species? Is there anything more specific about the old growth than that requirement in the plan? Just the strategies of how they go about doing that. What is your position, and I don't understand it. I'm lost in the trees most of this case, frankly. Yeah, the court in Lands Council v. Vought, which was a district court case from the East District of Washington, I think Judge Smith is familiar, it addressed that and basically said, well, if you get to the point where you're below those it takes a long time to replace centuries old habitat. Then it becomes incumbent on the Forest Service to justify a harvest of mature habitat. Because for some of these species, not all of them, but for like Kalia, woodpecker and goshawk, you can compensate for the lack of old growth with providing more and contiguous mature growth. They'll adjust to that type of landscape. That's expected. Again, what the forest plan always says is, if we violate these things or the trends are bad or whatever, then that will be a trigger for further action. So the further action is what you're referring to. It's like, we'll come up with a conservation strategy, and that's what the appellants in this case have been asking the Kootenai for many years is, what is your conservation strategy for these species? Can I address water quality? If you want to take some time for rebuttal, you've only got a minute left. I think I'll just go ahead and add one quick point on the water quality. Because I think it's also very important. It's about the connection of the arguments in the specific projects to our arguments about all of the, from our standpoint, shocking information that was never disclosed and actually exempted under FOIA and was brought out in litigation that preceded this. The most important point there is that the best management practices, which the Kootenai Forest relies upon to demonstrate compliance with water quality standards and protection of fisheries, have been found by their own experts not to be protective, in particular because of the failure to address system roads, which are the main haul routes into and out of the forest that are used. And here we're challenging 40,000 truckloads of logs going in and out of the forest along those haul routes that almost always go along major rivers and tributaries and add to the sedimentation. And their own experts said, we're not in compliance with NFISH, which is Inland Native Fish Strategy or whatever, which was their forest plan was all the forest plans were amended to incorporate those standards. And state audits found repeatedly that they were not complying with those standards. And our argument is simply that they've never disclosed that in a NEPA document for any of these sales and discussed it. So it's a disclosure argument under Robertson v. Methow Valley. And that's the underpinning of confidence of the public in this decision-making process and inclusion of the public in the decision-making process. And that whole shadow analysis that we've uncovered in the record in this case, where all the disturbing information is kind of kept out of the public and out of the NEPA documents. So you end up with these sanitized documents that say, oh, we're doing all this. They tell you all the good things they're doing, but they ignore the most significant issues. And, you know, this forest is a poster child for a broken forest. All of the watersheds are basically not functioning for the fish species. And you can't just, they need to address that. I mean, this is time to revise the forest plan and address these issues. And I want to give Scott an opportunity. Good afternoon. May it please the Court. Charles Scott on behalf of the Forest Service. The old growth arguments in this case that Mr. Woodbury is making really do require the Court to evaluate and substitute its scientific judgment for that of the agency. He is explicitly asking the Court to engage in second-guessing of reasoned scientific determinations. Let me focus your attention, though, on the 10 percent problem that I think both Mr. Woodbury and, of course, Judge Tallman have raised. In the Bristow 14 and Alder Creek chart, not chart, but information about 10 percent growth, you've got an effective 3.15 percent in Bristow, 9.73 percent in 14, and 8.40 percent in Alder. Where in the record can I find information showing that these, in fact, are meet the 10 percent standard? I'll provide the record sites. As an initial point, are we talking about whether you can include old growth from an adjacent compartment or watershed in order to meet the 10 percent standard? I'm assuming, based upon my understanding of the law, that you can, but you've got to show that it is, in fact, contiguous. You can't just take something that's not at all a measure that will bring you up to the 10 percent. So what I'm asking for, at least with respect to those three, where in the record can I find information to show that with replacement growth added in that they meet the 10 percent threshold? The standard is, in talking about contiguous, I just want to be sure we're not talking about the issue of fragmentation of old growth, but rather the separate requirement that for each, that the forest plan requires that in a given analysis area, a given compartment of the forest, or a third-order drainage, which refers to a third-order stream in the area that is drained by it, must reach 10 percent based on effective old growth of its own or effective old growth from an adjacent compartment or replacement growth within. I think that the site I would provide for the Bristow project is excerpts of record pages 306 and 310. And if you wouldn't mind reminding me which the other projects  Well, I'm sorry, 14 or Fortyne, I'm not sure how you do it. Oh, Fortyne.  Well, Fortyne's analysis is at pages 220 to 221 of the excerpts of record. And the last one is Alder Creek. And Alder Creek is pages 323 and 366 of the excerpts of record. I would like to point out that neither the Alder Creek nor the Fortyne project actually authorized any harvesting of designated effective old growth. And I believe the same is true of the So you're saying we shouldn't even be considering them for purposes of the analysis? I think that the, oh, no, no, no, not at all. I mean, I'm saying that the, there does have to be a connection between the forest-wide practice being challenged and alleged illegality in a given sale. So I think it is important to look at the fact that none of these projects actually authorizes commercial harvesting and designated effective old growth. There is a very limited amount of thinning of undesignated effective old growth. But these projects are being used as a vehicle to challenge a broader situation, and they may not be an apt vehicle. I think this is clearer in the case of the water quality claims than in the old growth claims. Mr. Woodbury is correct, is he not, that the forest plan does require you to maintain 10%, at least 10% old growth in these areas, does it not? It does. And I think our brief has shown that both forest-wide and in each of these projects, the 10% requirement is met. If you include the sites that you just gave, right? Yes, I believe so. I frankly couldn't find a tie-in, so I'm going to be looking at these carefully to be sure that you're correct, but I didn't find it. That was my problem, too. I was trying to figure out where these are, and is there a map? Can you answer my question that I posed to Mr. Woodbury? I don't think that there's a map in these current excerpts of record. You know, we had nine projects challenged. Mr. Woodbury provided two excerpts of record volumes. We provided five, but that still doesn't provide the opportunity to really include everything. Let's assume. Let me see if we can solve the court's problem. Is there a map out there somewhere you can still we can grant you leave to supplement the record if there's something more that was before the agency that did not get included in either of the parties' excerpts of record, if that will help the court understand your arguments? I will have to double-check on that. I believe the supplemental excerpts of record do contain maps of the project areas, and I think that might be sufficient. But if I could have the opportunity to double-check that and perhaps file. Why don't you file a Rule 28J letter after the argument if you check the record and there are such exhibits, and if they were not made a part of the record by either party, you may include them with your 28J letter. So we have them. Because we're trying to figure out what it was that was before the agency. Because as I understand Mr. Woodbury's argument, what he wants us to do is to declare that these projects do not meet NEPA or the forest plan, and therefore we should enjoin all future timber sales in the entire two-and-a-half-million-acre forest because of the deficiency. Respectfully, Your Honor, I do not think that is Mr. Woodbury's argument. In the facts section of his brief and in the facts section of our brief, you have statements of the amount of old-growth acreage of designated and effective being affected by each of these sales. But what he is telling you is that this 10 percent standard is no good forest-wide. And that is simply disproved by the record, which shows that this forest contains 10.5 percent old-growth if you only consider effective old-growth. Well, what is the government's position? Let's just assume, just arguendo, that in fact all of the forests, all the parts of this plant except Bristow, Fourteen, Fortyne, and Alder Creek are compliant. If they are not compliant with the 10 percent growth requirement, what is the government's position as to what we would do? Under the Administrative Procedure Act, you may set aside an agency action found to be invalid. But were that the case as to those three projects, those would be the only agency action found invalid. The government's position is that were we to find that to be the case, we would only be setting this aside as to those three parts but not to the rest of it, assuming for a moment that all the rest of the NEPA and Forest Management Act provisions were complied with. Is that correct? That's correct. I mean, the APA allows you to set aside agency action found to be unlawful. This brings me slightly into – I hope it's not my blackberry. It's the President's. What you have here is, especially with respect to these – to the water quality claims, is an attempt to challenge perceived forest-wide mismanagement, and it's perceived mismanagement based on documents that are 10 to 15 years old, that, as the district court found, isn't actually connected to an illegality in any of the projects that are before the court. In Neighbors of Cutty Mountain, this Court said you can challenge forest-wide management practices through a challenge to a site-specific action, but only to the extent that that action contemplates or is illegal because of this forest-wide illegality that you're referring to. As to the old growth issues, certainly even if the Court found flaws in those three the record shows, Supplemental Excerpt's record 1125 to 1127, this forest contains more than 10 percent effective old growth. And it contains – I have a question. Isn't that only true if the sections are contiguous? Well, as to the actual percentage of old growth, I mean, that's simply a numerical calculation. And the numbers for that are forest-wide, 10.5 percent is – What is the forest-wide? Are you talking about all of the forest included within this particular forest plan? All of the forest acres that are located below 5,500 feet of elevation. Above that – Does that include all of the land that we're talking about here, or is there additional land? That includes all of the land that we're talking about. I see. The entire forest exceeds – is 10.5 percent based on effective old growth, 11.1 percent based on designated old growth. And if one includes both effective and replacement old growth, I think the figure is 15.6 percent. So let me be sure I understand. Let's say hypothetically that you've got the whole forest laid out on a blackboard, and you say that in the aggregate it's 15-point-something percent. But let's just say that you took a line right down the middle so that you get – there were two widely separated parts of the forest, and you had maybe a 500-yard division in between. Is it the government's position that even though in the aggregate the forest plan would make up 15-something percent old growth, that the fact that these forests are not contiguous doesn't make any difference? The forest plan says that that inquiry is something that is very much site-specific, that it would be ideal if all of the old growth located in the forest were in stands that exceeded, I think, 100 acres or 1,000 acres. It would be ideal. Because of past fire history and past logging practices, by the time this forest plan was implemented in 1987, that simply wasn't the case. The fact is there are stands of old growth that are smaller than 50 acres. The forest plan acknowledges this. It says it's important that we hang on to the old growth we have. And this is on pages 71 to 74 of the excerpts of record where this discussion is included. And as to fragmentation, even a stand of old growth that is less than 50 acres in size may still provide meaningful habitat for an old growth-dependent species, and usually that requires that it be at least in proximity to another old growth stand and also surrounded by other mature forests. If there were just one old growth stand, desert, and another old growth stand, that might, in a site-specific analysis, not be found sufficient. And you're saying that the three sites or stands that I've referred to, they don't meet that desert-stand-desert situation. I do need to clarify the issue of fragmentation and the issue of counting land from an adjacent drainage to meet 10 percent. These are distinct issues. I believe that the three projects you're referring to were you didn't see how we hadn't shown how the amount of old growth in a given analysis area, which would be either a compartment or a third-order drainage, rose to 10 percent. The issue of fragmentation, that's a separate issue, whether a stand of old growth can still be meaningful habitat. And I think Judge Tolman might have been referring to that issue. If not, I'm mistaken. But the specific record sites involving the projects at issue where fragmentation might have been problematic are supplemental excerpts of record 925, which is the Alder Creek Project, excerpts of record 307, which is the Bristow Project, and excerpts of record 288, which is the South McSwede Project. The South McSwede Project, by the way, I believe is completed. It's the only one of the nine to be completed. So where it was necessary to do an analysis of is this too fragmented to be meaningful, the Forest Service performed that analysis. And I believe that as to the separate issue of do we meet the 10 percent requirement in each third-order compartment or third-order drainage or compartment, you know, I don't know if that was an argument that was really squarely raised in the opening brief, but I believe that in our brief and our recitation of the facts, we have shown that we have met that 10 percent standard as required by the Forest Plan with respect to each analysis area applicable to these projects. The explanation might not be perfect, but as long as the agency's reasoning can be shown, the Supreme Court has said that that is sufficient for arbitrary and capricious review. So are you claiming that Mr. Woodbury's client waived the argument because it wasn't raised in their opening brief? I don't know whether it was squarely presented. I think that is a question for the Court. It certainly isn't in the argument section of his brief, for what that's worth. And again, it's challenging a forest-wide practice through the reason that Neighbors of Cutty Mountain came up with this requirement saying, yes, you can challenge a forest-wide practice if you come up with a specific agency action that implicates the forest-wide illegality, goes to the APA's final agency action requirement, which in an earlier lawsuit, the same plaintiff attempted to sue over a failure of monitoring in the Kootenai in the late 90s. And this Court rejected that suit for lack of subject matter jurisdiction. This is Ecology Center v. Forest Service, 1999, saying, you know, you can't just say the Forest Service hasn't been doing something correctly forest-wide. You have to point to specific examples in the record of why something is wrong. Now, Neighbors of Cutty Mountain relied on that case and distinguished it, saying, in the case before us, there was a failure to monitor forest-wide, and it is implicated in this project. Wild West Institute here, particularly with respect to the water quality claims, has simply not made the connection between the forest-wide illegality that they claim existed on the basis of these 10- to 15-year-old documents and any final agency action that is squarely before the Court. So any forest-wide relief in this case is – has not been shown to be warranted. The only thing that could be found is that a given project perhaps didn't meet a standard. I really do think that our brief probably provides the best evidence possible that we did meet that 10 percent standard. But I'm not sure I understand what you just said. The challenge is to the management plan for particular areas of the forest, which are called projects. And you said earlier that there are no timber sales that are currently planned within at least the three that we were concerned about. Did I misunderstand? If I said that, I misstated that. There was associated – the primary purpose of these projects was not to harvest old growth by any means. There is some vegetation management within old growth. My point was none of these projects involves commercial harvesting of what is called designated effective old growth. There is some amount of commercial thinning in undesignated effective old growth in some of the projects. Again, this is something we laid out in our brief, although, again, when you have to explain the administrative records for nine projects in one brief, it's hard to provide the level of detail that a court might understandably want. My point was merely to say that those projects, none of the projects involve harvesting of designated effective old growth. So the connection to a forest-wide failure to protect effective old growth is – There are timber sales in the Fortyne project area. I'll call it the Fortyne management area, but your point is it wouldn't involve harvesting of old growth. Of designated effective old growth. I'm going to look at my notes very quickly, and I'll tell you exactly what I mean as to each of these projects. It would be helpful. Take all the time you want. Well, Your Honor, I'm afraid – oh, no, I've arrived at that page. So I think the first project that was referenced was Bristow. That involves no harvest of any designated old growth. It involves 21 acres of thinning in undesignated replacement old growth. So for purposes of our discussion, since you want to count replacement old growth in getting to the aggregate of over 10 percent, we have to include that, right, as if there were old growth being cut? The aggregate in the Bristow project is 13 percent, but yes. I believe – 13 percent? 13 percent if one includes 513 acres of undesignated old growth. And where in the record is that found? This is excerpts of record 306. I should say the Bristow project is the only project in which the 10 percent level is not reached based on effective old growth alone. That's something that might not be clear from our brief. It's the only one of nine. The other eight all meet the 10 percent level for old growth based on effective old growth alone.  The Bristow project is the only one that requires replacement old growth to be counted in order for the 10 percent level to be reached.    I think, Your Honor, with my time up, perhaps I should rely on my 28-J letter on those three projects. Can I ask you one thing, with permission of the presiding judge, before you sit down? Mr. Woodbury mentioned Appendix 17. My analysis of the record before was that this was not a binding part of the forest plan, and yet he's indicated that Appendix 17 has been adopted into some parts of the forest plan that are indeed enforceable. Do you agree with him about that? I think to the extent that it's referred to as detailed guidance for how Standard 4 might be met, it might have some relevance. I don't know that any aspect of it. I mean, clearly it's relevant in the sense people need to consult it, but the question is, is it law? Does someone need to comply with it? I think that what you must comply with in the forest plan, all projects have to be consistent with the forest plan. Right. But the binding standards are just those, the standards that are laid out early in the plan. I think the wildlife standard is Standard 4. Appendix 17 provides detailed guidance on how to implement Standard 4. I do think that our brief shows that we have complied with amendments in Appendix 17 to the extent it refers to counting replacement old growth, counting stands that are smaller than 50 acres but might still provide useful habitat. I don't think there's any question that we didn't. From your perspective, it's management analysis, but it's not legally binding. Again, all decisions have to be consistent with the governing plan, but it is not a binding standard. It is more guidance on how to consider whether a standard is met. If I could very quickly give some context for what I mean by that, the standard for wildlife is provide 10 percent old growth habitat to ensure viability of old growth dependent species. And it says one of the ways in which this may be shown is through achievement of 40 percent of the potential population. It says may be shown. The analysis later on in Appendix 17 refers to the fact that 10 percent is the right level of habitat for pileated woodpeckers. The Forest Service here has shown that there is sufficient habitat. There is 10 percent old growth that supports a population that is within the minimum potential viable population range. So it does provide guidance. It is different, however, from a forest plan standard, I would say. Would you agree that if it were binding, the Forest Service would have a problem? With 40 percent? If it were not phrased as may be, each management area may also contribute toward achieving this objective through. Were it not for that language, we would be in a different situation. But if it said it must be, in other words, if it were adopted into something, it is a binding legal concept. To the extent that it appears under the heading of standard four, I suppose so. But that is not the situation, thankfully. Thank you, Mr. Scott. Thank you for your time. I wonder, Presiding Judge, if I could just ask Mr. Woodbury to provide us with a 28-J letter indicating the bases upon which you say that Appendix 17 is binding, a binding part of the forest plan. I think you indicated that in your oral argument, but it would be helpful to me and I think probably the other panel members if you could provide that to us in writing in a 28-J letter. I'm almost positive that we addressed that in our recollection. Maybe you can refresh our recollection. If you want to look now and give us a page like that, we'll save you the drafting of the letter. Let's see. Yeah, I can have a site for that, too. Okay, so wildlife standard four, which is page Roman numeral 2-22 of the forest plan. I don't have the excerpt record site, but it says, the maintenance of viable populations of existing native and desirable non-native vertebrate species as monitored through indicator species will be attained through the maintenance of a diversity of plant communities and habitats. Specific forest guidelines exist and will be applied for cavity habitat and dependent species, Appendix 16, old growth habitat and dependent species, Appendix 17. So that's basically saying we will apply these. So we would argue that makes them enforceable. Do you recall what page that is in your brief or in whatever it is you submitted? I don't. Okay. No, it's in the reply brief, though, in response. Okay. All right, we'll see if we can figure this all out. The case just argued is submitted. Thank you both, and we'll be adjourned for the day. All rise.
judges: Tallman, Smith, Reavley